**IN THE UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

ELLIS RAY BARBER                  *
                                      *
         Plaintiff            *
                                        *
V.                              *        NO:  4:08CV04155   SWW
                                      *
C1 TRUCK DRIVER TRAINING LLC,  *
ET AL.                          *
                                      *
         Defendant

## <u>ORDER</u>

Ellis Ray Barber ("Barber"), an African-American, brings this action against his former employer, C1 Truck Driver Training LLC ("C1"), and others.[1]  Before the Court is C1's motion for summary judgment (docket entries #25, #27, #28), Barber's response in opposition (docket entries #35, #36, #38, #39), and C1's reply (docket entry #48).  After careful consideration, and for reasons that follow, summary judgment will be entered in Defendants' favor.

### I.  Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to

---

[1]In addition to C1, Barber names defendants C&S Acquisition, Inc. and Driver Holdings LLC, claiming that these entities are related to C1 and qualify as co-employers.  *See* docket entry #36, at 64-65.

support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has properly supported its motion for summary judgment, the non-

moving party must "do more than simply show there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

The nonmoving party may not rest on mere allegations or pleading denials, but must "come

forward with specific facts showing that there is a genuine issue for trial." *Id*. at 587(internal

quotations and citation omitted). "Only disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment." *Anderson*

*v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or

unnecessary will not be counted." *Id*.

## II.  Background

Defendant C1 trains commercial truck drivers.  In August 2003, David Morgan

("Morgan"), who served as the director of C1's North Little Rock location, hired Plaintiff Barber

to work as a driving instructor.  From the date of his hire through December 2007, Barber's job

performance was satisfactory, and in December 2007, he received an award and financial bonus

for "the most outstanding performance for the month" Docket entry #48, Add. at 35, 178.

In 2006, Morgan hired Barber's wife, Karmen, but C1 terminated her employment later

that year.   Following her termination, Karmen Barber filed race discrimination charge with the

Equal Employment Opportunity Commission ("EEOC"), and it was common knowledge among

C1 employees that Barber supported his wife's claim.  Docket entry #38, Add. at 236-37

(Simpson Dep. at 74, 75).   The EEOC dismissed Karmen Barber's charge in 2007, and she

elected not to pursue litigation.

In November  2007, Morgan announced that he was vacating the director's position, and two people applied for the job:  Plaintiff Barber and Tami Simpson ("Simpson"), a white female who worked as a student recruiter in C1's administrative office.  C1's  president, Matt Carroll ("Carroll"), and vice president, Tim Megard ("Megard"),  traveled to North Little Rock to interview Barber and Simpson.  After consulting Morgan about Barber's and Simpson's qualifications, Carroll and Megard interviewed both applicants and selected Simpson for the director's job.

On December 14, 2007, Barber filed an EEOC charge, claiming that C1 failed to promote him in retaliation for his lending support to his wife's 2006 EEOC charge and because of his race.  *See* docket entry #38, Add. at 46.

On January 14, 2008, after Simpson assumed the director's position, she instructed Barber to administer weekly drug tests to driving students.  Normally, such tests were administered by two certified testers, but Barber followed Simpson's instruction and conducted the tests alone.  The next day, Barber met with Simpson and complained that she had retaliated against him by instructing him to perform drug tests without an assistant.  *See* docket entry #25, Ex. C (Barber Dep. at 83-84).  Simpson explained that she was too busy to help him administer the tests, but Barber was not satisfied, *see* docket entry #25, Ex. C (Barber Dep. at 84), and he told Simpson that "a person could have the right to refuse an order from their supervisor if they believed it to be discriminatory or retaliatory for having filed a [discrimination charge]."  Docket entry #25, Ex. C (Barber Dep. at 111-112).

Barber reports that during his meeting with Simpson, she asked him whether he had discussed his wife's discrimination charge with C1 students, and he replied that he had discussed

the topic only with C1 employees.  *See* docket entry #38, Add. at 166 (Barber Dep. at 86).

Barber testifies that Simpson then informed him that she would be watching his job performance,

and he responded that observation of his performance could be construed as retaliation.  *See*

docket entry #38, Add. at 168 (Barber Dep. at 88).  According to Simpson, she did not intend to

convey that she would be scrutinizing Barber's job performance, only that as the new director,

she intended to work with each instructor in order to "learn their jobs" and "see exactly what

they were doing."  Docket entry #38, Add. at 223 (Simpson Dep. at 48-49).

On January 16, 2008, Barber felt ill, and he asked Simpson for time off to see a doctor

and to contact the EEOC.  *See* docket entry #25, Ex. C (Barber Dep. at 92-93).  Barber testifies

that he "felt like the conversation he had the day before with . . . Simpson was a type of

harassment[,]" and he told Simpson that his illness was directly related to "being harassed for

filing a charge."  Docket entry #25, Ex. C (Barber Dep. at 93); docket entry #38, Add. at 172

(Barber Dep. at 94).  Barber recalls that Simpson told him that he had a right to take personal

time off, but she needed to call Megard first.  *See* docket entry #38, Add. at 172 (Barber Dep. at

96).  C1 provides a copy of an email dated January 16, 2008 from Megard to Carroll, regarding

the January 16 meeting:

> Tami called me this [morning] at about 7:20 as I was driving to the office.  She had
> Ray in her office along with Althea and another C1 staff member as a witness.  Ray
> wanted to talk to me on speaker about his issues.  He claimed that he was ill after
> yesterday and wanted to . . . see a doctor.  He stated that he was dehydrated, couldn't
> sleep or eat after the day he had on Tuesday.  He cited that Tami had asked him why
> he was telling students that C1 had wronged his wife and that she had taken action
> against us.
>
> He said that we had been served on December 20th papers on his lawsuit and he had
> also filed with EEOC yesterday after work I guess.  He wanted to start arguing and
> I told him that I was not going to argue with him.  I had him pick up the phone earlier

in the conversation because I couldn't hear him.  Once I told him I was not going to argue he seemed to get more irritated.  I told him that I couldn't tell him what to do or not do but that [C1] had hired him to be a classroom instructor and him being able to perform his duties did concern me.  Once he could tell that I wasn't going to argue and make a scene about it, he hung up[,] and Tami said he walked out.

I am going to have Tami and others present also write a statement on Ray's behavior.  I called back after relaying to Matt [Carroll] that Ray blew up and I feel that he is trying to do anything to get us to fire him.  Maybe after talking to a lawyer and EEOC, he feels that only way to better his position is if we actually fire him.  I guess we need to decide today what Tami should tell him if and when he comes back.  I am having Tami . . . get statements from any students that Ray talked to about Karmen.

Docket entry #38, Add. at 57.

Barber took two days off, January 16 and 17, and when he returned to work, Simpson instructed him to provide a doctor's note.  Although Barber did not refuse Simpson's order and eventually provided a doctor's note, he questioned Simpson's authority and informed her that C1's policy manual required a doctor's note when an employee missed "more than" two days of work.  *See* docket entry #36, at 12.

On January 23, 2008, Megard personally handed Barber a disciplinary action form, which reads as follows:

On January 15, 2009, Ray [Barber] met with Tami Simpson. In the meeting Ray was rude and disrespectful toward Tami.  Ray told Tami that she should not have gotten the director[']s  position.  He also told her that he could do whatever he wants because he is covered by the EEOC based on his wife filing a claim against C1.  This behavior is intolerable.  Tami is Ray Barber's supervisor and there is no excuse for speaking to anyone in the company this way let alone his supervisor.  It is also insubordination to tell is supervisor that she cannot supervise him because if she does, he will go to the EEOC and say that he was retaliated against because of his wife's prior EEOC claim.  Future insubordination will result in termination.

On January 16, 2008 Ray spoke in a loud and rude manner to both Tami Simpson and Tim Megard.  He then stormed out of the office saying he had to go to the doctor immediately.  Upon returning to work on January 20th, Tami told Ray that he would need to get a doctor's excuse.  Ray told Tami that per [the] handbook he did not have

to which is insubordination.  Tami had to again tell Ray that he must get a doctor's excuse.  After following up with the doctor's office, Tami found out that Ray never went to the doctor on the 16th.  He went the following morning[,] but he got the doctor's office to write an excuse beginning on the 16th.  Rude speech toward your supervisor and other employees is grounds for termination.  Leaving work in the middle of the day and lying about the necessity to do so is also grounds for termination.  Similar behavior in the future will result in termination.

What is also apparent after the two discussions on the 15th and 16th and some follow up with other employees is that Ray talks about C1 to other employees in a very negative way.  We promote a positive work environment for our employees and cannot tolerate an employee that has nothing but negative things to say.  If Ray continues to talk negatively to others about C1, it will result in termination.

Ray has also discussed company matters with at least one other employee.  Specifically, he discussed his wife's EEOC claim against C1 with a fellow employee.  He also attempted to talk said employee into lying to help his wife win her claim.  Discussing company matters with unauthorized persons is prohibited by company policy.  Should Ray discuss sensitive company matters with any unauthorized person again, termination will result.

Docket entry #38, Add. at 41.

On February 23, 2008, Simpson received a complaint from one of C1's students, stating that he felt discriminated against because Barber was inviting only African-American students to his church.  *See* docket entry #25, Ex. E (Simpson Dep. at 75 and Ex. P12); docket entry #48, Ex. #1 (Carroll Aff., ¶8).   At the time, C1 had a written policy stating: "Relationships with students in the program should be kept on a professional basis.  This applies to both instructors and staff."  Docket entry #38, Add. at 52.

On February 27, 2008, Simpson instructed Barber that he was to cease transporting students to church.  *See* docket entry #25, Ex. C (Barber Dep. at 124).   But despite Simpson's directive, on March 2 and 9, 2008, Barber picked up students at the driving school and transported them to his church.  *See* docket entry #25, Ex. C (Barber Dep. at 122-125).

On March 10, 2008 Megard met with Barber and notified him that his employment with

6

C1 was terminated, effective immediately.   The notice of termination states as follows:

> Ray received a final written warning on January 23, 2008 for insubordination.  This written warning stated that future insubordination would lead to his termination.  Because of recent insubordination, see details below, Ray is terminated effective immediately.

> Additional Remarks: On February 27, 2008, Tami told Ray he was not to socialize with C1 students outside of work and that he was not permitted to pick up the students and take them to church.  On Sunday March 2, 2008, Ray drove the church bus onto company property to pick up and drop off students.  By doing this, he was disobeying the orders of the school Director.  This is insubordination.

Docket entry #38, Add. at 43.

On November 14, 2008, Barber filed this lawsuit pursuant to Title VII of the Civil Rights Act of 1964 and the Arkansas Civil Rights Act ("ACRA"), claiming that C1 terminated his employment and failed to promote him based on his race and retaliated against him for activity protected under Title VII and the ACRA.

### III.  Discussion

A.   <u>Race Discrimination - Failure to Promote</u>

Because Barber presents no evidence that directly points to the presence of a racially discriminatory motive,  the Court will analyze his failure-to-promote claim under the three-stage order of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972).[2]  To establish a *prima facie* case of discrimination based on a failure to promote, Barber must show that (1) he was a member of a protected group; (2) he was qualified and applied for a promotion to an available position; (3) he was not selected for the position; and (4) a similarly-situated employee who was not a member of a protected group was selected instead. *Allen v. Tobacco*

---

[2]Barber's discrimination claims under the ACRA are properly analyzed under the same framework.  *See Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 n. 3 (8th Cir.2000).

7

*Superstore, Inc.* 475 F.3d 931, 937 (8th Cir. 2007)(citing *Shannon v. Ford Motor Co.*, 72 F.3d 678, 682 (8th Cir. 1996)).

If Barber establishes a *prima facie* case, the burden of production shifts to C1, which must rebut the presumption of discrimination with evidence that Barber was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once C1 meets its burden, Barber may prevail by pointing to evidence which, if believed, would expose C1's stated reason as a mere pretext for intentional discrimination. *Id.*

C1 asserts that, even assuming Barber can establish a *prima facie* case of discrimination, it rejected his application for the following nondiscriminatory reasons: (1) based on information provided by Morgan, Carroll and Megard concluded that Simpson was better qualified for the job; (2) Carroll developed concerns regarding Barber's sincerity and loyalty to C1; and (3) Carroll found that Simpson performed better than Barber during interviews. Because C1 has proffered non-discriminatory reasons for its hiring decision, in order to survive summary judgment Barber must (1) discredit C1's asserted reasons and (2) show that the circumstances permit a reasonable inference that race was the real reason for the decision. *See Johnson v. AT & T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005).

*Proffered Reason: Information from Morgan*

Carroll testifies that Morgan recommended Simpson for the director's position, *see* docket entry #38, Add. at 130 (Carroll Dep. at 19), and Megard recalls that Morgan reported that Barber would have difficulty working with staff because he was abrasive and arrogant. *See* docket entry #25, Ex. B (Megard Dep. at 38). Additionally, it is undisputed that Carroll took

notes during Barber's interview, which he used to create a memo entitled "Hiring Decision."[3] That memo states that Morgan recommended Simpson because (1) Barber could be arrogant, abrasive and divisive; (2) Barber's performance had been slipping; (3) Barber worked only enough hours to keep his insurance; (4) Simpson was respected by the staff; (5) Simpson had government contacts, which could help C1's student enrollment; and (6) Simpson was dependable and ran the operation in Morgan's absence.   *See* docket entry #25, Ex P3.

Barber does not dispute that Morgan provided the foregoing information, but he insists that Morgan "only presented information . . . and did not make a recommendation one way or the other."  Docket entry #36, at 7.   Barber presents Morgan's affidavit, which states:  "I did not recommend one of them  over the other.  It was not my decision to make, and I did not suggest that either Ray Barber or Tami Simpson should or should not be promoted."  Docket entry #38, Add. at 110 (Morgan Aff. ¶ 11).  Additionally, Morgan recalls that he provided Carroll and Megard the following information:

- Barber and Simpson each possess good, but different, qualifications that would be valuable for a director to have, but each have issues that could hinder their ability to perform as director.

- Barber has superior qualifications because he had fleet management experience in the military, he has a commercial  driver's  license ("CDL"), and he is an excellent instructor.

- While Barber has more training, background, and qualifications in the industry, some of the trainers  are concerned about Ray  becoming the

---

[3]In response to C1's statement of facts, Barber denies that Carroll documented the decision to select Simpson, but in his brief in opposition to summary judgment, he acknowledges that "Carroll took notes from the interview and produced a memo entitled "Hiring Decision." Docket entry #36, at 6.  Also, Barber submits the "Hiring Decision" memo as evidence that in making the decision to promote Simpson, Carroll considered information that Barber threatened to file an EEOC charge if his bid for promotion was rejected.  *See* docket entry #36, at 6.

director because they simply are not very fond of Ray.

•      Tami Simpson, on the other hand, has sales and office experience; but there are trainers who are concerned that she lacks the qualifications and experience to be the site director, and she does not have a CDL.

•      The number of trainers who disfavored Ray and the number of trainers who disfavored Tami were approximately equal.

C1 contends that it is "wholly incredible" that Megard and Carroll would have discussed the hiring decision with Morgan without asking for his recommendation, and even accepting that Morgan made no recommendation, it is undisputed that Morgan supplied negative information about Barber (that he was arrogant and abrasive, his performance had declined, and he worked minimum hours) and positive information about Simpson (that she was respected by the staff, she had government contracts, and she ran the operation in Morgan's absence). Furthermore, C1 asserts that neither Barber's military experience nor his CDL made him a superior candidate. Carroll testifies by affidavit that C1 directors are not required to have a CDL, he and several C1 directors do not have a CDL, and the director's position is an administrative job that does not require advanced knowledge about commercial truck driving. *See* docket entry #48, Ex. #1 (Carroll Aff., ¶3).

The Court finds that Morgan's affidavit fails to cast doubt on C1's assertion that the hiring decision was influenced by Morgan's "recommendation." Even assuming that Morgan did not specifically recommend Simpson as the best candidate for promotion, based on the information that Morgan did provide, Carroll and Megard could have reasonably concluded that he endorsed Simpson. Furthermore, C1 proffers additional reasons for rejecting Barber's bid for promotion, which must be considered. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (noting that "an employer would be entitled to judgment as

10

a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred").

*Proffered Reason: Carroll's Concerns*

It is undisputed that before Carroll decided to promote Simpson, he learned that Barber had informed the lead instructor at the North Little Rock campus, David Moore ("Moore"), that he would file a discrimination charge against C1 if the company rejected his application for the director's position.[4]   Additionally, Barber acknowledges that during his interview, he was asked to recount the most difficult situation he had encountered during his employment, to which he replied, "[D]uring my wife's claim."  Docket entry #38, Add. at 151 (Barber Dep. at 48).  According to Barber, Carroll stopped him and directed him "not to talk about that." *Id.*

C1 asserts that Carroll perceived Barber's threat to take legal action  and his reference to his wife's EEOC charge during the interview as signs that he was disloyal and insincere.  Carroll's  "Hiring Decision" memo reflects such a perception and reads in part as follows:

> h. Per David Moore, Mr. Barber told him on 11/26/2007 that if Ms. Simpson was given the director job, . . . he would put in his . . . notice and file a lawsuit for discrimination.  Honestly, why in the word would the company promote a person who had such a negative view of the company?
>
> I. In the interview, Mr. Barber brought up, unprompted and on his own, that

_____

[4]In Deposition, Barber testified: "[M]y statement to him [Moore] was if I did not get the position, I would exercise my right under the law to challenge that."  Docket entry #25, Ex. C (Barber Dep. at 49).

his wife's termination from C1 was controversial.  I personally believe he did this so that he could later [say] that it was brought up and if he wasn't hired, he could use that as the reason.

j.  If you look at "h" and "I" it is clear that Mr. Barber had an agenda.

Docket entry #25, Ex. B, P3.

Barber argues that the foregoing excerpt from Carroll's memo "essentially [shows] Carroll's attitude that anyone who expresses the right to file an EEOC charge [has] 'a negative view of the company.'" Docket entry #36, at 20.  However, the hiring memo indicates that Carroll believed that Barber attempted to manipulate the hiring decision by threatening legal action before his interview and mentioning his wife's EEOC charge during his interview, and Barber presents no evidence that Carroll's concerns were rooted in racial discrimination or retaliation.

*Proffered Reason:  Interview Performance*

Carroll's  "Hiring Decision" memo contrasts Simpson's and Barber's interview performance as follows:

- Mr. Barber was more concerned that the equipment wasn't up to his standards than he was about keeping the morale of the employees where it needed to be. . . . Ms. Simpson thought the transition would be successful if she could sit down with each employee individually. She seemed to have a better understanding of what was needed.

- Mr. Barber didn't seem to understand the needs of the position.  He thought he could be the only tester for a 3rd party cdl testing business (a full time job) and still be able to be the school director.  This is not feasible.   Ms. Simpson had deep roots throughout government agencies to help cultivate students on the recruiting side.

- He thought some of the staff would leave if he was hired.

- He wasn't able to give a very good answer for the understanding of our business.  He talked about students being the revenue, which is

> really only a portion of the business.  Ms. Simpson showed a greater
> knowledge of the business, describing it as having intricate parts, like
> carriers that we contract with, students, government agencies, Driver
> Solutions and employees.

Docket entry #25, Ex. B, P3.  Barber presents no evidence to discredit C1's claim that the decision to promote Simpson was based in part on Carroll's assessment that Simpson's answers to interview questions were superior to Barber's.

*Evidence Offered to Show Pretext*

Barber argues that C1's proffered reasons for failing to promote him are pretext for race discrimination because (1) Carroll refused to shake his hand; (2) C1 failed to hire African-Americans for director positions; (3) C1 subjected him to disparate treatment; and (4) C1 discriminated against David Moore.  For reasons that follow, the Court finds no evidence of pretext.

*Lack of African-American Directors*.   Barber testifies:  "During my tenure at C1, over the years I came to be familiar with who the directors were at the other C1 facilities.  I never saw or heard of an African American ever holding the position of director at any C1 facility." Docket entry #38, Add. at 121 (Barber Aff. ¶4).  Barber provides no data to corroborate his testimony, nor does he provide information regarding the pool of candidates from which the directors referenced in his testimony were selected.   Barber's vague, anecdotal evidence regarding a lack of African-American directors provides no basis for reliable, statistical analysis, and it fails to show pretext.

*Carroll's Refusal to Shake Barber's Hand*.  Barber claims that Carroll refused to shake his hand before interviewing him for the director's position.   He also reports that when "the parties, witnesses, and attorneys arrived at the depositions [in this case], handshakes were exchanged

between all, except when Ray Barber cordially offered his hand to Matt Carroll, Carroll refused to shake Ray's hand . . . . " Docket entry #36, at 14.  Carroll denies that he refused to shake Barber's hand before interviewing him, but he admits that he refused to shake his hand at depositions, stating: "He's filed a lawsuit against my company.  I don't see the need to be nice."  Docket entry #25, Ex. A (Carroll Dep. at 5).  Even assuming that Carroll refused to shake Barber's hand on two occasions, such conduct without more  does not point to racial bias.

*Disparate Discipline*.  Barber asserts that C1 gave preferential treatment to four C1 employees who are not African-American and did not engage in activity protected under Title VII:  Rony Ramirez, Danielle Nicole Harris, David Morgan, and Tami Simpson.   Barber reports that Ramirez, who worked for C1 in March 2006 as a housekeeper, received multiple disciplinary notices for a litany of transgressions, including insubordination, and was finally terminated on February 8, 2009 for "poor quality of work."  Docket entry #38, Add. at 83-87. Barber charges that Ramirez received favorable treatment because he had multiple warnings before he was finally discharged.

The record shows that Ramirez received a warning for insubordination–specifically, for working overtime in contravention of Simpson's directions.  *See* docket entry #38, Add at 88-89. However, the record contains no evidence that Ramirez, like Barber, was charged with multiple instances of insubordination before his final termination or that Ramirez informed his supervisor that he was entitled to refuse orders that he deemed discriminatory or retaliatory.

Barber presents evidence that C1 took the following disciplinary actions against Harris before finally terminating her employment:

> (1) a verbal warning for insubordination--specifically, failing to complete filing in a timely manner and failing to clock in (docket entry #38, Add. at 92);

14

(2) a written warning for insubordination--specifically, failing to complete filing in a timely manner, making personal calls, and failing to answer calls (docket entry #38, Add. at 93);

(3) a verbal warning for tardiness (docket entry #38, Add. at 94);

(4) a written warning for insubordination--specifically,  failing to complete filing tasks in a timely manner;

(5) a final written warning for insubordination--specifically, refusing to complete tasks as instructed and refusing to cease personal business at work; and

(6) a final written warning for tardiness (docket entry #38, Add. at 97).

Barber asserts that C1 gave Harris preferential treatment by giving her multiple warnings for insubordinate behavior before firing her.   The Court finds that although C1 classified Harris's conduct as "insubordination" on written discipline forms,  Barber's admitted acts of insubordination–telling Simpson that he did not have to follow her orders and questioning her authority to demand that he present a doctor's note–are not comparable to Harris's transgressions--failing to complete filing in a timely manner, tardiness, and conducting personal business at work.

Barber presents evidence that C1 fired Morgan for failing to properly conduct student drug tests, which caused negative publicity for C1.  C1, however, rehired Morgan because, according to Megard, "he learned from his mistake . . . . "  Docket entry #38, Add. at 283 (Megard Dep. at 44).  The circumstances surrounding Morgan's termination and rehire have nothing in common C1's employment decisions regarding Barber.

On March 17, 2009, Megard issued Simpson a final, written disciplinary action form for making the following "poor" decisions:

1.     Hiring Derrick Puckett (a C1 student) without proof of  minimum experience;

2.      Permitting employee Derrick Puckett to live in the student dormitories;

3.      Allowing access C1's computer system without supervision, resulting in unauthorized background checks;

4.      Failing to investigate for misconduct after smelling alcohol on the breath of several employees;

5.      Allowing employee Tim Thomas to live in the student dormitories;

6.      Allowing a former student, Rickie Brown, to reside in the student dormitories;

7.      Failing to investigate a sexual harassment complaint; and

8.      Failing to discuss all the foregoing decisions with supervisors.

Docket entry #38, Add. at 108.  Simpson signed the disciplinary form beside the words  "I agree with this statement."  *Id*.  Nothing in the record indicates that Simpson challenged her supervisors' authority or failed to follow a supervisor's specific instructions.  In fact, the evidence indicates that Simpson admitted that she committed the conduct outlined on her disciplinary form.

Although instances of disparate treatment can support a claim of pretext, Barber has the burden of proving that the disparately treated employees were "'similarly situated in all relevant respects.'"  *Harvey v. Anheuser-Busch, Inc*., 38 F.3d 968, 972 (8th Cir. 1994)(citing *Jones v. Frank*, 973 F.2d 673, 676 (8th Cir.1992)(quoting *Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir.1988)).   To be probative of pretext and discrimination or retaliation, the misconduct of more leniently disciplined employees must be of comparable seriousness.  Here, the Court finds that the proposed comparators' misconduct was unlike Barber's.

*Moore's Termination*.  Barber offers a single example of alleged race discrimination

16

against another African-American employee: David Moore.[5]   In January 2009, C1 terminated

Moore's employment.  Barber claims that Moore "had likewise participated in protected activity

and was terminated by the same decision-makers at C1 for a single infraction, in spite of several

years on the job with no previous disciplinary record."  Docket entry #36, at 53.   Moore testifies

by affidavit that C1 terminated him for conduct committed by other employees, who were not

terminated.  Docket entry #38, Add. at 115-116.

The Court finds that evidence of a single instance of discrimination against another

African-American employee fails to show that the proffered reasons for rejecting Barber's

application for promotion are pretext for race discrimination.

In sum, the Court finds that Barber has failed to present any ground for disbelieving C1's

explanation for rejecting his bid for promotion or evidence that race was the real reason behind

the hiring decision.

B.      Race Discrimination - Wrongful Termination

C1 asserts that it discharged Barber for insubordination–specifically, for defying

Simpson's instruction to cease driving students to church.  It is undisputed that on February 27,

2008, Simpson instructed Barber to cease inviting and transporting C1 students to church, *see*

docket entry #36, and that Barber transported students to church on March 3 and March 9, 2008.

*See* docket entry #25, Ex. C (Barber Dep. at 1275-127); *see also* docket entry #36, at 13.

Barber proposes that Simpson's deposition testimony indicates that the focus of her

February 27 directive to him was "the need for him to be careful in his communications with

_____

[5]As previously stated, Moore served as the lead instructor at C1's North Little Rock
location.

17

students, not with transporting them." Docket entry #36, at 42. However, Simpson testified in deposition that Barber "was told not to take his students in his personal vehicle and socialize with them outside of work" and that after he received that directive, Simpson observed him in C1's parking lot driving C1 students in his personal vehicle. Docket entry #38, Add. at 243-245 (Simpson Dep. at 83-85). What is more, Barber testified in deposition that Simpson "singled him out" and forbade him from transporting students to church, stating: "She told me that - - in fact, there were several trainers - - we were on break. And she came up and singled me out and told me that in the future I was *not to pick up students and take them to church* and socialize with them and that they should be riding in the church van." Docket entry #25, Ex. C (Barber Dep. at 124).

Barber argues that during his employment at C1, it was common for instructors to transport out-of-town students to local churches and other places and that no other C1 instructor was ever disciplined for driving students to local churches. However, it is undisputed that days before Simpson instructed Barber to stop driving students to work, she received a complaint from a student named Derrick Puckett, stating that he felt discriminated against because Barber was inviting only African-American students to his church. *See* docket entry #25, Ex. E (Simpson Dep. at 75 and Ex. P12); docket entry #48, Ex. #1 (Carroll Aff., ¶8). Barber provides no evidence that similar complaints were lodged against other instructors or that other instructors received favorable treatment under similar circumstances.

Barber argues that Simpson's testimony regarding Puckett "does not pass the smell test" because it is undisputed that Simpson hired Puckett without proof of minium experience and allowed him to live in student dormitories at a time when he was not a student. Barber argues:

"Simpson seemed to have a special relationship with Puckett and apparently favored Puckett enough to go out on a limb for him . . . . A reasonable jury might wonder what favor Simpson was repaying to Puckett by allowing him to live on campus and hiring him so soon after graduation . . . [,] and the jury might ultimately question the veracity of Puckett's statement. That is, if Puckett, who has long since been fired by C1, can be located and subpoenaed to trial." Docket entry #36, at 48.

The Court finds that Barber's suggestion that Puckett's complaint was manufactured or the product of a conspiracy amounts to sheer speculation, which is insufficient to show that the reason for his termination is pretext for race discrimination.  *See Luciano v. Monfort, Inc.*, 259 F.3d 906, 910 (8th Cir. 2001)(holding that plaintiff's testimony that he was "set up" by his employer to provide a nondiscriminatory reason for his termination was insufficient to withstand summary judgment).

In sum, the Court finds that C1 has come forward with a legitimate, nondiscriminatory reason for terminating Barber's employment, which Barber has failed to rebut.  Accordingly, C1 is entitled to summary judgment on Barber's claim that C1 terminated his employment based his race.

C.    <u>Retaliation Claims</u>

Barber states his retaliation claims as follows:

Defendants' actions in (a) failing to promote Plaintiff to position of director, (b) scrutinizing Plaintiff's performance, (c) treating Plaintiff differently from others who did not engage in protected activity, (d) disciplining Plaintiff on January 23, 2008, and (e) terminating Plaintiff's employment amount to retaliation under Title VII.

Amend. Compl., ¶ 22.

For a prima facie case of retaliation,[6] Barber must show that (1) he engaged in protected conduct; (2) a reasonable employee would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct.  *See  Stewart v. Independent School Dist. No.* 196, 481 F.3d 1034, 1043 (8th Cir. 2007).  If Barber  establishes a prima facie case, the burden shifts to C1 to show a non-retaliatory reason for the complained-of conduct.  *Id.*   If C1 meets this burden of production, Barber must present evidence that "'(1) creates a question of fact as to whether [C1's] reason was pretextual and (2) creates a reasonable inference that [C1]  acted in retaliation.'" *Id.* (quoting *Logan v. Liberty Healthcare Corp.,* 416 F.3d 877, 880 (8th Cir. 2005)).

Regarding Barber's claims that C1 failed to promote him and terminated his employment in retaliation for engaging in protected conduct, as explained above, Barber has failed to rebut C1's proffered reasons for these decisions.  Accordingly, no issues for trial exist as to these claims. *See Putman v. Unity Health System* 348 F.3d 732, 737 (8th Cir. 2003)(affirming dismissal of retaliatory termination claim when plaintiff failed to show that employer's nondiscriminatory reason for the termination was pretextual).  Title VII's prohibition of retaliation for protected activity  does not insulate an employee from the consequences of insubordination.  *See Jackson v. St. Joseph State Hosp*., 840 F.2d 1387, 1391 (8th Cir. 1988)(noting that anti-retaliation provisions do "not clothe the complainant with immunity for past and present inadequacies,

_____

[6]Barber's retaliation claims pursuant to the ACRA are analyzed according to the same framework applicable to his analogous claims under Title VII.  *See Island v. Buena Vista Resort*, 352 Ark. 548, 103 S.W.3d 671, 676 (2003); *Flentje v. First Nat'l Bank*, 340 Ark. 563, 11 S.W.3d 531, 537 (2000).  *See Burkhart v. American Railcar Industries, Inc*., 603 F.3d 472, 477 (8th Cir. 2010)("We analyze Burkhart's Title VII and ACRA retaliation claims in the same manner.).

unsatisfactory performance, and uncivil conduct in dealing with subordinates and with his peers.").

As for charges that C1 retaliated against Barber by scrutinizing his performance and disciplining him on January 23, 2008, these allegations do amount to materially adverse employment action and are subsumed by Barber's wrongful termination claim.  *See Littleton v. Pilot Travel Centers, LLC*, 568 F.3d 641, 644 (8th Cir. 2009)(quoting *Gilbert v. Des Moines Area Cmty.*, 495 F.3d 906, 917 (8th Cir. 2007)("[T]o be materially adverse, retaliation cannot be trivial; it must produce some 'injury or harm.'").

Finally, for reasons previously stated, Barber has failed to show that he was similarly situated to employees who he claims received favorable treatment.  In sum, the Court finds no genuine issues for trial with respect to Barber's retaliation claims.

## IV.

For the reasons stated, the Court finds no genuine issues for trial in this case. Accordingly, Defendants' motion for summary judgment (docket entry #25) is GRANTED. Pursuant to the judgment entered together with this order, this case is DISMISSED WITH PREJUDICE.

It is so ordered this 18th day of October 2010.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE